# Illinois Official Reports

## Appellate Court

***People v. Kines*, 2015 IL App (2d) 140518**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN E. KINES, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-14-0518 |
| Filed | July 24, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 88-CF-90; the Hon. Robert G. Kleeman, Judge, presiding. |
| Judgment | Reversed and remanded with direction. |
| Counsel on Appeal | Jon Loevy, Russell R. Ainsworth, and David B. Owens, all of Loevy & Loevy, and Tara Thompson, of Exoneration Project, both of Chicago, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa A. Hoffman, Assistant State's Attorney, of counsel), for the People. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Justices Burke and Spence concurred in the judgment and opinion. |

**OPINION**

¶ 1    This case concerns a criminal defendant's statutory right to the postconviction DNA testing of evidence as provided for in section 116-3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/116-3 (West 2012)). The criminal defendant in this case, John E. Kines, filed a section 116-3 petition for DNA testing, which the trial court denied on two grounds. First, because Kines filed a petition for testing in 2002, the trial court found that Kines' new petition was barred under *res judicata* principles. Second, the trial court found that Kines' present petition failed to satisfy the statutory criteria to warrant testing. We reverse and remand.

¶ 2                                  I. BACKGROUND

¶ 3    In 1988, Kines was found guilty of several offenses in connection with the murder of 11-year-old Taneka Jones. We summarize the relevant evidence from Kines' bench trial.

¶ 4    Taneka's body was discovered on the morning of January 10, 1988, in the basement of an apartment complex in Hinsdale. Witnesses testified that Kines was dropped off at the apartment complex around 1 a.m. so that he could visit his "girlfriend."

¶ 5    Cornell Finley, who was 11 years old at the time of trial, testified that he and his mother lived in the apartment complex, as did Taneka and her mother. The children's mothers went out at around 6 p.m. and left the children in the living room in the Finley apartment, where Cornell and Taneka watched television together. Neighbors Clayton Jordan and Saul Berry briefly visited the Finley apartment that night and left. Cornell testified that he overheard Berry say to Jordan, "we should kidnap these two," before they left.

¶ 6    Later, Kines, a friend of the Finley family, whom Cornell knew as "Uncle John," came to the apartment and watched television with Cornell and Taneka. Jordan returned to the apartment and spoke with Kines in the dining room; Cornell overheard Jordan tell Kines that he "would see him later." Kines went into Cornell's mother's room to sleep and Cornell fell asleep on the couch where he and Taneka were watching television.

¶ 7    Cornell was awoken by a noise in the middle of the night; he saw Jordan put something around Taneka's face and drag her into the bedroom. Cornell approached the bedroom door and peered inside. He saw Taneka naked on the bed. Berry was holding Taneka's head while Jordan was moving up and down on top of her with his pants unzipped. Kines was standing in the room, shirtless, looking on. Cornell heard Taneka say, "Stop[,] that hurt[s]."

¶ 8    Cornell briefly went back to the living room and pretended to be asleep. When he returned to the bedroom door and looked inside, he saw Taneka on a blanket on the floor. Berry was holding Taneka's head, Jordan was holding her legs, and Kines was strangling her with a "cloth" around her neck. Cornell saw Taneka's hands shaking; then she stopped moving. Berry, Jordan, and Kines wrapped Taneka in the blanket and carried her down to the building's basement.

¶ 9    Cornell followed them down to the building's basement. There, he saw Berry and Kines laughing as Jordan masturbated while standing over Taneka. Jordan was holding a white tissue or tissues in his other hand. Cornell ran back upstairs and pretended to be asleep on the couch. Berry, Jordan, and Kines returned to the apartment; the three men sat next to Cornell

and told him that if he told anyone what had happened it "would be the same way" for him and his mother.

¶ 10 Taneka's mother returned the following morning. She discovered her daughter's body in the basement and called the police. The police initially interviewed Cornell in the apartment, in Kines' presence. Cornell testified that, because he was afraid of Kines, he told the police that he did not see anything because he was asleep, that he did not see Kines strangle Taneka, and that an unknown man entered the Finley apartment sometime that night. Cornell also denied being promised anything in exchange for his testimony.

¶ 11 Taneka's body was found in a mesh storage locker in the basement of the apartment building. The locker was constructed of chicken wire and wood, and the basement was described as "filthy" by several witnesses. Taneka was found wearing a shirt and a sweater, but unclothed from the waist down; her jeans and her underwear were found nearby. Taneka had bruises and abrasions on her face, and paint chips from the basement were found inside her mouth. A ligature–later determined to be the left sleeve of a blouse that belonged to Jordan's sister–was found tied onto Taneka's neck. Police removed the ligature and Taneka's clothing and secured those items as evidence. A forensic pathologist determined that Taneka died as a result of ligature strangulation. There was dirt on the inside of the ligature knot. Police also recovered three white tissues near the body. Serological testing matched semen stains on the tissues to Jordan's blood type, to the exclusion of Kines and Berry. In addition, Berry's fingerprints were found on a locked door near the location of the body. The State introduced into evidence Taneka's clothing, the ligature, and the semen-stained tissues. The parties stipulated that Kines' hair was not found on or near Taneka's body or her clothing. During closing argument, Kines asserted that Taneka was killed in the basement by Jordan and Berry, and not in the Finley apartment as the State had argued.

¶ 12 The trial court found Kines guilty of intentional first-degree murder based on accountability (see Ill. Rev. Stat. 1985, ch. 38, ¶ 5-1 (explaining that a criminal defendant charged by accountability is liable for the actions of his or her codefendants)), concealment of a homicidal death, and one count of intimidation (for threatening Cornell). (Jordan and Berry were also found guilty. *People v. Jordan*, 205 Ill. App. 3d 116 (1990); *People v. Berry*, No. 2-88-1259 (1990) (unpublished order under Supreme Court Rule 23).) The trial court sentenced Kines to a 50-year aggregate prison term.

¶ 13 Kines appealed his conviction and this court affirmed. *People v. Kines*, No. 2-88-1176 (1991) (unpublished order under Supreme Court Rule 23). His petition under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2000)) was unsuccessful (*People v. Kines*, No. 2-98-1060 (1999) (unpublished order under Supreme Court Rule 23)), as was his request for *habeas corpus* relief in federal court (*Kines v. Godinez*, 7 F.3d 674 (7th Cir. 1993)).

¶ 14 In 2002, Kines, *pro se*, filed a petition for "DNA testing" of the State's evidence under section 116-3 of the Code. The trial court denied the petition because the requested "DNA testing" was "technology [that was] available at the time [of Kines' trial and] had been available for a number of years." Kines appealed and this court affirmed. *People v. Kines*, No. 2-02-0930 (2003) (unpublished order under Supreme Court Rule 23) (*Kines I*). We interpreted  request for the testing of Taneka's clothing and the ligature as a "narrow" request for the testing of hairs recovered from those items, and we held that this evidence would be cumulative of the parties' stipulation that Kines' hair was not found at the scene.

¶ 15    In 2013, Kines, through counsel, filed the instant petition for DNA testing under section 116-3 of the Code (725 ILCS 5/116-3 (West 2012)). In it, Kines sought DNA testing of the ligature, the victim's clothing, and the tissues, all of which he alleged were never previously subjected to DNA testing. In contrast to his earlier petition, this time, Kines requested a specific type of DNA test–"PCR-STR testing," or short tandem repeat testing (STR) wherein any present DNA is amplified by a polymerase chain reaction (PCR). Kines further requested that any eligible results, *i.e.*, those yielding at least 13 core loci, be uploaded to CODIS, the FBI's Combined DNA Index System. Kines also alleged that the petition was not barred by the filing of his first section 116-3 petition, because (1) in contrast to the Post-Conviction Hearing Act (see 725 ILCS 5/122-1(f) (West 2012) (only one postconviction petition may be filed without leave of court)), nothing in section 116-3 of the Code barred successive petitions for testing, and (2) since his first request in 2002, there had been significant "advancements in DNA science" such as the ability to obtain "touch DNA" from evidence and a five-fold increase in the size of CODIS.

¶ 16    The State filed a response asserting that Kines' 2013 request for testing was barred by our decision in *Kines I* under the doctrine of *res judicata*. The State "t[ook] exception" to what it perceived as Kines' failure to preemptively argue against the application of *res judicata*, an affirmative defense. The State further faulted Kines for failing to show that "advancements in DNA science *since the 2002 motion*" (emphasis added) would have affected Kines' *initial* request for testing. The State did not dispute the facts alleged in Kines' section 116-3 petition and it did not otherwise contest the petition on the merits.

¶ 17    After a hearing, the trial court denied Kines' petition for DNA testing. In its oral ruling, the court characterized the petition as asserting that touch DNA "might detect matters [that] weren't detected [when the evidence] had been *previously tested.*" (Emphasis added.) The trial court then found that (1) Kines' petition was barred by *res judicata*, and (2) if *res judicata* did not apply, then Kines had failed to establish that DNA testing offered "a reasonable likelihood of *more probative* results." (Emphasis added.)

¶ 18    Kines filed a motion to reconsider. The court held a hearing on the motion where, for the first time, the State acknowledged that the evidence in question had *not* previously been tested. The trial court denied Kines' motion to reconsider, stating that, even if "somebody else's" DNA were found on the evidence, it would not "change the evidence indicating the defendant's guiltiness." Kines timely appealed.

¶ 19    II. ANALYSIS

¶ 20    We first address Kines' contention that the trial court erred when it determined that, in light of our decision in *Kines I*, *res judicata* barred his present request for forensic DNA testing. *Res judicata* is an equitable doctrine that bars the relitigation of issues that were raised and adjudicated in a prior proceeding. *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 44. "*Res judicata* bars not only what was actually decided in the first action but also whatever could have been decided." *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008). This doctrine results "from the practical necessity that there be an end to litigation and that controversies once decided on their merits *** remain in repose." *Hughey v. Industrial Comm'n*, 76 Ill. 2d 577, 582 (1979). Whether a claim is barred by *res judicata* is a question of law, which we review *de novo*. *Lutkauskas*, 2015 IL 117090, ¶ 43.

¶ 21    Under *res judicata*, "[(1)] a final judgment on the merits rendered by a court of competent jurisdiction operates to bar a subsequent suit between [(2)] the same parties and involving [(3)] the same cause of action. [Citations.]" *Id.* ¶ 44. By virtue of this framework, the State argues that *res judicata* applies, and, if rote application of those factors were our only concern, we would agree that *res judicata* bars Kines from relitigating this issue. But *res judicata* is first and foremost an equitable doctrine, which "may be relaxed where justice requires." *Cload v. West*, 328 Ill. App. 3d 946, 953 (2002). In other words, the question is not solely *whether* the doctrine of *res judicata* applies; we must also ask whether it *should be* applied.

¶ 22    Kines' claim comes within a well-established exception to the general rule of *res judicata*: a second action is not barred when "the judgment in the first action was plainly inconsistent with the equitable implementation of a statutory scheme." *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 341 (1996) (citing Restatement (Second) of Judgments § 26(1) (1980)). In this case, the statutory scheme that we are concerned with is section 116-3 of the Code, which sets forth the procedures for requesting and obtaining postconviction DNA testing. Kines filed his first petition for DNA testing under section 116-3 of the Code in 2002. At that time, section 116-3 did not distinguish between previously tested and untested evidence. See 725 ILCS 5/116-3(a) (West 2002). Rather, in all instances, a defendant was required to show that "the technology for the [requested] testing was not available at the time of trial." *Id.* Citing this requirement, the trial court denied Kines' first section 116-3 petition because the requested "DNA testing" was technology that was available at the time of Kines' trial in 1989 (see *People v. Wardell*, 230 Ill. App. 3d 1093, 1097 (1992) (noting that DNA testing became available for use in criminal trials in October 1987)), and we affirmed the petition's dismissal in *Kines I*.

¶ 23    In 2007, however, the legislature amended section 116-3(a) of the Code. See Pub. Act 95-688 (eff. Oct. 23, 2007). Section 116-3(a) now distinguishes between evidence that has previously undergone DNA testing and evidence that has never been tested, as follows:

> "(a) A defendant may make a motion before the trial court that entered the judgment of conviction in his or her case for the performance of *** forensic DNA testing, *** on evidence that was secured in relation to the trial [or guilty plea] which resulted in his or her conviction, and:
>
>> (1) was not subject to the testing which is now requested at the time of trial; or
>>
>> (2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results." 725 ILCS 5/116(a) (West 2012).

As our supreme court has noted, the amended statute imposed "a more stringent obligation on defendants seeking re-testing of evidence." *People v. Stoecker*, 2014 IL 115756, ¶ 24. Conversely, the amended statute also removed the requirement that defendants seeking *initial* DNA testing establish that the "technology" for the requested testing was unavailable at the time of trial. In other words, "[f]ollowing the October 2007 amendment to section 116-3, it was sufficient for defendant to request forensic testing on evidence secured in relation to his trial and allege only that the evidence was not previously subject[ed] to the testing he was now requesting." *People v. Boatman*, 386 Ill. App. 3d 469, 472 (2008).

¶ 24    In 2002, the trial court's denial of Kines' section 116-3 petition was based solely on a condition, *i.e.*, the unavailability-of-testing requirement, that the legislature removed from the statute in 2007. We decline to hold *Kines I* against Kines' 2013 petition. Given the change in the statute with respect to as-yet-untested evidence, we determine that reliance on our decision in *Kines I* would be inconsistent with the equitable implementation of section 116-3 of the Code. See *Gurga v. Roth*, 2011 IL App (2d) 100444, ¶ 17 (stating that "[r]es judicata should be applied only as fairness and justice require"). Accordingly, the trial court erred when it held that the present litigation was barred by our decision in *Kines I.*

¶ 25    We next address Kines' contention that the trial court erred when it denied his section 116-3 petition on the merits. A ruling on a motion for postconviction testing under section 116-3 is based on the pleadings, so we review it *de novo. Stoecker*, 2014 IL 115756, ¶ 21; *People v. Rozo*, 2012 IL App (2d) 100308, ¶ 4. Kines argues that his petition met all of the elements under section 116-3 to warrant postconviction DNA testing. We agree. Section 116-3 is divided into three subsections and we address each subsection in turn.

¶ 26    As noted above, section 116-3(a) requires that the evidence the defendant seeks to have tested either (1) was not subjected to the testing that is now requested at the time of trial (725 ILCS 5/116-3(a)(1) (West 2012)); or, (2) although previously subjected to testing, can be subjected to additional testing utilizing a method that was not scientifically available at the time of trial that provides a reasonable likelihood of more probative results (725 ILCS 5/116-3(a)(2) (West 2012)). In the trial court, the State conceded that Taneka's clothing, the ligature, and the tissues were never tested. Therefore, section 116-3(a)(1) has been satisfied.

¶ 27    We note that in its oral ruling the trial court repeatedly referenced the requirements of section 116-3(a)(2); it stated that the evidence "had been previously tested" and thrice stated that Kines had failed to show that there was a "reasonable likelihood of more probative results." Aside from *res judicata*, it appears that the trial court's sole basis for denying the petition was that Kines had failed to satisfy the elements of section 116-3(a)(2), which was inapplicable. Neither party called this mistake to the trial court's attention or addresses it in their appellate briefs. We reiterate that Kines' petition met the requirements of section 116-3(a)(1).

¶ 28    Section 116-3(b) requires the defendant to present a *prima facie* case that (1) identity was the issue at the defendant's trial, and (2) the evidence to be tested has been subject to a chain of custody to ensure its integrity. 725 ILCS 5/116-3(b)(1), (b)(2) (West 2012). At trial, Kines argued that Cornell Finley's testimony was not credible and that his identification of Kines was mistaken. Kines also argued that Taneka was not killed in the bedroom of the Finley apartment as Cornell testified, but that she was killed in the basement by Jordan and Berry. Accordingly, there was a sufficient *prima facie* case concerning identity. See *People v. Shum*, 207 Ill. 2d 47, 66 (2003) (finding that identity was the central issue at trial, despite the strength of the State's eyewitness identification, because defendant had "consistently denied involvement in the crimes").

¶ 29    In his appellate brief, Kines asks us to remand this case to the trial court so that he can conduct limited discovery on the issue of chain of custody. See, *e.g.*, *People v. Travis*, 329 Ill. App. 3d 280, 285 (2002) (holding that the trial court may allow limited discovery on the evidence's chain of custody). Although the State has acceded to this request, we are not bound by the State's concession. See *People v. Horrell*, 235 Ill. 2d 235, 241 (2009). In *People v. Johnson*, 205 Ill. 2d 381 (2002), our supreme court held that a defendant is excused

from establishing a chain of custody for evidence that was admitted at his or her trial, since, presumably, the admitted evidence would have remained within the custody of the circuit court clerk. *Id*. at 393. Therefore, the chain-of-custody requirement has been satisfied and the *prima-facie*-case requirement of section 116-3(b) has been fulfilled.

¶ 30　　　Finally, section 116-3(c) states that the court shall allow the requested testing, provided that it determines that (1) the result of the testing has the scientific potential to produce new, noncumulative evidence materially relevant to the defendant's assertion of actual innocence even though the result might not completely exonerate him, and (2) the requested testing is generally accepted in the scientific community. 725 ILCS 5/116-3(c) (West 2012). DNA testing is, of course, generally accepted in the scientific community, and so we turn to the material-relevance requirement.

¶ 31　　　"Evidence which is materially relevant to a claim of actual innocence is evidence which tends to significantly advance that claim, and, pursuant to the express terms of the statute, need not completely exonerate a defendant." *People v. Smith*, 2014 IL App (1st) 113265, ¶ 24 (citing *People v. Savory*, 197 Ill. 2d 203, 213-14 (2001)). In determining whether testing would reveal materially relevant evidence, we consider the trial evidence and assess the evidence that the defendant seeks to acquire through testing. *Rozo*, 2012 IL App (2d) 100308, ¶ 11. We emphasize that this is an independent determination; the strength of the State's evidence is not a hurdle that the defendant must overcome to meet the requirements of the statute. *Id*. (citing *People v. Barrow*, 2011 IL App (3d) 100086, ¶ 27).

¶ 32　　　There was little direct evidence in this case. The State's primary evidence came from 11-year-old Cornell Finley. While perhaps reasonable in light of Kines' threats, Cornell still made several inconsistent statements to the police, including that he slept through Taneka's murder, saw an unknown person enter the apartment that night, and did not see Kines strangle Taneka. Kines maintained that he had no connection to the murder and that Taneka died in the basement at the hands of Jordan and Berry.

¶ 33　　　We note that Kines was convicted of first-degree murder based on a theory of accountability and, thus, any DNA evidence linking Jordan and Berry to the crime would tend to inculpate defendant as well. See *People v. Rodriguez*, 229 Ill. 2d 285, 294 (2008) (stating that, when codefendants are charged by accountability, the act of any one defendant is attributed to all, and all of the defendants "must answer for the result" (internal quotation marks omitted)). However, we cannot dismiss the very real possibility that DNA testing might result in a viable third-party suspect, particularly in light of Cornell's statement to the police that an unknown man entered the Finley apartment on the night of the murder. As our supreme court has said, "if the legislature had intended to limit application of the statute to the instances in which a test result favorable to the defendant would, standing alone, lead to his complete vindication, it would have chosen a different way of expressing the statutory requirements." *Savory*, 197 Ill. 2d at 213.

¶ 34　　　　　　　　　　　　　　　III. CONCLUSION

¶ 35　　　In *Rozo*, we said that there was "no reason not to test the already extant DNA evidence of the two other men whom defendant alleges were actually involved in the murder." *Rozo*, 2012 IL App (2d) 100308, ¶ 21. Here, there is no reason not to test key physical evidence that was admitted at Kines' trial in 1989. Kines met all of the requirements under section 116-3 of the Code and his petition for postconviction DNA testing should have been granted.

For these reasons, the judgment of the circuit court of Du Page County is reversed and the cause is remanded for the trial court to enter an order granting Kines' petition for DNA testing.

¶ 36        Reversed and remanded with directions.